RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 7/12/11

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| **COMAR MARINE CORP.** | **CIVIL ACTION NO. 09-1438** |
| **VERSUS** | **JUDGE HAIK** |
| **RAIDER MARINE LOGISTICS, LLC ET AL** | **MAGISTRATE JUDGE HILL** |

## RULING

UPON CONSIDERATION of the parties' cross motions for partial summary judgment [Rec. Docs. 117 & 120], and after oral argument heard on June 16, 2011 in front of Judge Richard T. Haik, Sr., the court rules as follows:

### BACKGROUND

On May 21, 2008, Nautical Investment Corp. an affiliate[1] of Comar Marine Corp. (Comar) sold the M/V Marauder n/k/a Lady Eldine to the defendant Marauder Marine Logistics, L.L.C. (MMLLLC). The sale agreement required that MMLLLC simultaneously execute a Master Managment and Operating Agreement (management agreement) [Rec. Doc. 132-2, p 4 of 9, ¶ 12] hiring Comar to "manage, maintain books and records, operate, maintain, oversee and supervise the chartering, crewing, provisioning, maintenance and repair of the vessel" [Rec. Doc. 132-4, p 1of 18]. The sale agreement also warranted that, at the time of delivery of the vessel, it is "free and clear of all encumbrances and maritime liens" [Rec. Doc. 132-2, p 1of 9, ¶ 4]. In accordance with the sale agreement, MMLLLC and Comar simultaneously executed the

---

[1] "Affliate company" is the term used in the Purchase and Sale Agreement created by Comar's counsel.

management agreement.

The sale between Comar and MMLLLC was financed by Comar and was secured by a ship mortgage in favor of Comar. On August 21, 2008, MMLLLC refinanced the vessel with Allegiance Bank Texas (Allegiance). With some of the money obtained from Allegiance, MMLLLC satisfied its note with Comar, and Comar's mortgage was cancelled. Allegiance secured the refinance with a preferred ship mortgage which it recorded on August 27, 2008.

On August 15, 2009, MMLLLC terminated the management agreement. Three days later, Comar filed a Verified Complaint and proceeded with seizure of the vessel. It alleged to have a preferred maritime lien on the vessel for damages arising out of MMLLLC's breach of the management agreement. Allegiance intervened asserting its preferred mortgage lien for the remaining balance from the refinance. On September 22, 2009, MMLLLC posted security and the vessel was released. Comar and Allegiance filed cross motions for partial summary judgment concerning their respective rights to the vessel. Comar claims that MMLLLC's breach of the management agreement gave rise to a maritime lien from the date the agreement was executed. Allegiance argues that Comar is not entitled to a maritime lien since the law on maritime liens is *stricti juris* and neither statutory nor case law recognize breach of a maritime contract as giving rise to a maritime lien. Secondly, Allegiance argues that if the court determines that breach of a maritime contract gives rise to a maritime lien, Comar remains precluded from obtaining a lien due to its "joint venture" relationship with MMLLLC. Thirdly, Allegiance argues that the court should exercise its equitable discretion in estopping Comar from asserting a lien, since the sale from Nautical to MMLLLC represented that it was free and clear of all encumbrances and liens despite simultaneously placing a lien on the vessel in favor of Comar. Finally, Allegiance argues that should the court determine that Comar is entitled to a lien, it is inferior to Allegiance's

preferred mortgage since MMLLLC did not breach the agreement until after the mortgage was recorded. It argues that the date of the breach of the agreement, rather than its execution, is the proper time to establish its priority.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

"[A] preferred mortgage lien . . . has priority over all claims against a vessel (except for expenses and fees allowed by the court, costs imposed by the court, *and preferred maritime liens)*". 46 U.S.C. § 31301(5)(A) (2011). The United States Supreme Court established the current rule for determining whether a contract is a maritime contract. It held "that the true criterion and crucial consideration for determining admiralty jurisdiction is the 'nature and subject matter of the contract at issue." (internal quotations omitted) *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). The *Exxon* Court also enumerated a list of factors to consider when determining whether a contract is a maritime contract. However, it is not necessary to give a detailed discussion of the *Exxon* test since it is uncontested that the management agreement at issue is a maritime contract.

A "preferred maritime lien" means a maritime lien on a vessel--

(A) arising before a preferred mortgage was filed under [46 U.S.C. § 31321];

(B) for damage arising out of maritime tort;

(C) for wages of a stevedore when employed directly by a person listed in 46 U.S.C. § 31341];

(D) for wages of the crew of the vessel;

(E) for general average; or

(F) for salvage, including contract salvage;

46 U.S.C. § 31301(5) (2011).

> Maritime liens are *stricti juris* and will not be extended by construction, analogy, or inference. *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 41 S.Ct. 1, 4 (1920). Moreover, they are largely statutorily created. *See Lake Charles Stevedores, Inc. v. Professor Vladimir Popov M/V*, 199 F.3d 220, 224 (5th Cir. 1999), cert. denied, 529 U.S. 1130, 120 S.Ct. 2006, 146 L.Ed.2d 956 (2000). Thus, to determine the validity of a maritime lien, we must normally refer to statutory law or those liens that have been historically recognized in maritime law. *Id.*

*Racal Survey U.S.A., Inc. v. M/V Count Fleet*, 231 F.3d 183, 192 (5th Cir. 2000).

Thomas Shoenbaum's *Admiralty and Maritime Law* treatise lists the following maritime liens that have been recognized under United States law:

1. Wages of the ship's master and crew.

2. Salvage operations.

3. General average claims.

4. Claims for breach of a charter party.

5. Preferred ship mortgages.

6. Claims under maritime contracts for repairs, supplies, towage, pilotage, wharfage, and a wide variety of other "necessaries."

7. Claims for maritime torts including personal injury and death, and collision claims.

8. Claims for damage or loss of cargo.

9. Claims by the carrier of cargo for unpaid freight and demurrage.

10. Pollution claims.

1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 9-1 (4th ed. 2010), available at ADMMARL § 9-1 (Westlaw).

The United States Supreme Court described the origin of maritime liens in the following way.

> Maritime liens are not established by the agreement of the parties, except in hypothecations of vessels, but they result from the nature and object of the contract. They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist.

*Newell v. Norton*, 70 U.S. 257, 262, 1865 WL 10771, 4 (1865).

Comar contends that MMLLLC's breach of the management agreement gives rise to a maritime lien in its favor. It relies on the Fifth Circuit case *International Marine Towing, Inc. v. Southern Leasing Partners, Ltd. International Marine Towing, Inc. v. Southern Leasing Partners, Ltd.*, 722 F.2d 126 (5th Cir. 1983). *International Marine* held that "breach of a maritime contract" gives rise to a maritime lien since the damages are of a "maritime nature and flow directly from the breach of a maritime contract". *Id.* However, although *International Marine* crouched its ruling in terms of "breach of a maritime contract", the contract at issue in that case was a charter party. As previously mentioned, breach of a charter party has historically been recognized as giving rise to a maritime lien. Therefore, the language used in *International Marine* was overly broad. It was unnecessary for that court to determine whether breach of a non-charter party maritime contract gives rise to a maritime lien, and the court did so without a full debate on the issue. In the present case, Comar was not a charterer, nor was a charter agreement executed. Rather, Comar was the manager of the vessel with a duty to obtain charters for MMLLLC. Therefore, this court finds that this case is distinguishable from *International Marine*, and insofar as *International Marine's* language applies to non-charter party maritime contracts, it is not bound by such language.

Comar has not established that breach of a maritime contract is a recognized method of establishing a maritime lien. There is no statute to that effect, and the only jurisprudence, i.e.: *International Marine*, supporting that notion is dictum. Since, maritime liens are *stricti juris*,

this court does not find that breach of a non-charter party maritime contract alone establishes a maritime lien. Since the management agreement was not a charter party, breach thereof does not give rise to a maritime lien.

Had the court determined that Comar is entitled to a maritime lien when MMLLLC breached the management agreement, it would still need to determine whether Comar and MMLLLC were involved in a joint venture. Courts have created an equitable exception to preferred maritime liens when the purported lienor and the vessel owner are engaged in a joint venture.

The "joint venture" exception to maritime liens is based on "the equitable notion that those who share responsibility for incurring the debts of the vessel ought not to be reimbursed out of the vessels' proceeds to the detriment of other lienholders." *Cantieri Navali Riuniti v. M/V Skyptron*, 621 F. Supp. 171, 186 (W.D. La. 1985). Joint venturers cannot hold a maritime lien. *See Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204 (5th Cir. 1978). *Sasportes* identified several factors to consider when determining whether parties are joint venturers. Among them are the parties' intentions, proprietary interest, profit and loss distribution and exercise of joint control. However, the *Sasportes* court noted that it is common that joint venturers delegate control among themselves, rather than exercise joint control. *Id.* It also stated that these factors are not to be applied mechanically, and none are determinative. *Id.*

It is apparent from the various agreements and arrangements that Comar and MMLLLC entered into that they intended on forming a joint venture. Nautical sold the vessel on credit to MMLLLC under the mandatory condition that MMLLLC employ Nautical's affiliate, Comar, to manage and operate the vessel. Through Comar, Nautical continued to possess the vessel after the sale and until termination of the contract. Comar had virtual complete control over the vessel

during the existence of the contract. Additionally, Comar retained a right of first refusal should MMLLLC decide to sell the vessel.

Comar's proprietary interest in the vessel is evidenced by its appearance as the apparent owner of the vessel. The vessel was painted in Comar's colors and boasted Comar's emblem. Its crew was a Comar crew. Comar also exercised all of the chartering authority, incurred operational expenses and entered into various contractual relationships regarding the vessel.

Although Comar does not share equally in the profits and losses, its management fee was structured so that it could share in the revenues. In applying the *Sasportes* analysis the Eleventh Circuit found that the profit and loss sharing element is satisfied if the "arrangement suggest[s] that profit from the enterprise was a motive for both parties." *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 211-213 (11th Cir. 1991). As in *Fulcher's Point*, the underlying motive for both Comar and MMLLLC was for the arrangement to produce a profit. Therefore, the court finds that the profit and loss sharing element is satisfied.

Comar exercised control over the vessel. It had physical possession of the vessel and controlled its movements. It had sole discretion and authority to charter the vessel, and the charters and other contractual relationships were the sole property of Comar. It maintained the books and records accounting for all income and expenses applicable to the vessel, including invoicing, receivables and payables. It controlled the crew, including hiring, firing and compensation. It also obtained insurance on the vessel and made all decisions regarding supplies, repairs, maintenance, and improvements to the vessel. As such, the court finds that the control element is also satisfied.

Consequently, the court finds that the parties were engaged in a joint venture and assuming *arguendo* that breach of the management agreement gave rise to a maritime lien, the

joint venture relationship would preclude Comar from obtaining a lien on the vessel.

The court does not find it necessary to address the remaining estoppel and priority issues since they are moot in light of the foregoing rulings.

**CONCLUSION**

For the aforementioned reasons, the court finds that there is no dispute as to any genuine issues of material fact with respect to the nonexistence of Comar's asserted maritime lien. As such, Allegiance is entitled to judgment as a matter of law. Comar does not have a maritime lien on the Lady Eldine f/k/a M/V Marauder. All else equal, breach of the management agreement did not give rise to a maritime lien. Nevertheless, if it did, Comar would still be precluded from asserting a lien due to its joint venture with MMLLLC. Therefore, Comar's motion for partial summary judgment [Rec. Doc. 117] is DENIED, and Allegiance's motion [Rec. Doc. 120] is GRANTED.

THUS DONE AND SIGNED this _11th_ day of July 2011 in Lafayette, Louisiana.

DISTRICT JUDGE RICHARD T. HAIK, SR.
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA