U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED · LAFAYETTE

MAY 2 0 2013

TONY R. MOORE, CLERK
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| COMAR MARINE CORPORATION F/K/A NAUTICAL OFFSHORE CORPORATION | NO. 6:09-CV-1438 (LEAD) NO. 6:12-CV-1533 (MEMBER) |
| VERSUS | JUDGE RICHARD T. HAIK, SR. |
| RAIDER MARINE LOGISTICS, L.L.C., ET AL. | MAGISTRATE JUDGE C. MICHAEL HILL |

### REASONS FOR RULING

This case filed by Comar Marine Corporation *f/k/a* Nautical Offshore Corporation ("Comar") against Raider Marine Logistics, L.L.C. ("Raider Marine"), *in personam*, Conqueror Marine Logistics, L.L.C. ("Conqueror Marine"), *in personam*, Marauder Marine Logistics, L.L.C. ("Marauder Marine"), *in personam*, Enforcer Marine Logistics, L.L.C. ("Enforcer Marine"), *in personam*, Tracy P. Lirette, *in personam* ("Lirette") and Chris St. Amand, *in personam* ("St. Amand"), (sometimes referred to collectively as "Owners"), arises from an action under admiralty and maritime law pursuant to Rule 9(h) of the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 of the Federal Rules of Civil Procedure.

This matter was tried before the Court as a bench trial conducted on February 26, 27 and 28, 2013 with the parties' agreement that the record would remain open until the parties completed the trial deposition of John Oliver and the rebuttal testimony of Charles Tizzard, both of which were filed into the record on April 1, 2013. Based on the evidence adduced at the trial on the merits, the Court makes the following findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52(a).  To the extent any of the following findings of fact comprise conclusions of law or a mixed finding of fact and law, they shall be considered as such.

*Findings of Fact*

The following facts were stipulated to by the parties or have been established by a preponderance of the evidence:

1. Comar Marine L.L.C. ("Comar") is Louisiana LLC in the business of operating and chartering various classes of vessels to third parties engaged in the offshore oil and gas exploration and production industry.

2. Comar operates a fleet of vessels owned by its affiliated companies (also referred to as "Comar"), and from time to time enters into management agreements with third-party owners for the operation and management/marketing of third-party owners' vessels to end-users.

3. Gator Offshore, LLC ("Gator") is a Louisiana limited liability company whose members are TPL Management Services, LP and Gator Consulting, LLC.

4. Tracy Lirette ("Lirette") is the 99% limited partner of TPL Management Services, LP, whose 1% general partner is Global Coast Services, LLC.

5. Chris St. Amand ("St. Amand") is the sole owner and manager of Gator Consulting, LLC.

6. Conqueror Marine Logistics, LLC, Enforcer Marine Logistics, LLC, Raider Marine Logistics, LLC, and Marauder Marine Logistics, LLC (collectively, "the Marine Logistics Entities") are Louisiana limited liability companies, each of which has as its sole member Gator Offshore, LLC.

7. The Marine Logistics Entities are the owners of the vessels M/V CONQUEROR, M/V ENFORCER, M/V RAIDER, and M/V MARAUDER ("Vessels").

8. The CONQUEROR, RAIDER and ENFORCER are U.S.-flag 120 foot class crewboats and were purchased by the related Marine Logistics Entities on January 31, 2007 with financing from J.P. Morgan Chase Bank, N.A. on a three-year amortized pay-off schedule, secured by preferred ship mortgages.

9. The MARAUDER is a 135 foot class crewboat and was purchased from Comar by the related Marine Logistics Entity for $975,000.00, on May 21, 2008, with financing from Allegiance Bank, secured by a preferred ship mortgage.

10. In 2007, The Marine Logistics Entities and Gator Offshore, LLC purchased the M/V CONQUEROR, M/V ENFORCER and M/V RAIDER from Comar and, as a condition

precedent, entered into separate Master Management and Operating Agreements ("Agreements") with Comar for each of the Vessels, dated January 31, 2007.

11. Each of the Agreements was for a term of three (3) years and was identical to each other except for vessel- and Owner-specific information.

12. Under each Agreement, Comar agreed to market, manage and operate the Vessels in exchange for the payment by the Owners of a management fee equal to the greater of $3,000 per calendar month or ten (10%) percent of the gross income of each vessel per month ("Management Fees"). [Agreements, Art. 2.]

13. The Agreements authorized Comar to deduct the Management Fees from revenues received from the chartering of the Vessels and remit the balance to Owners, "subject to any right of Comar to withhold additional amounts from such charter revenues as permitted by [the] Agreement." [Agreements, Art. 3.]

14. All expenses incurred by Comar in operating the Vessels were for the account of and at the sole expense of Owners, including all costs of crewing, supplies, equipment and necessaries, maintenance and repairs, mooring and insurance ("Owners' expenses"). [Agreements, Art. 4.]

15. The Agreements provided that these expenses would be reimbursed to Comar from funds held on account of Owner or, if sufficient funds are not immediately available to Comar, Owners weres to pay Comar these unreimbursed amounts within ten (10) days invoicing by Comar. [*Id.*]

16. The Agreements gave Comar the option, if requested by Owners, to fund Owner Expenses by borrowing against outstanding Accounts Receivable ("A/R"), which Comar claimed ownership of and controlled entirely. [Agreements, Art. 3(f), 3(c ).]

17. In such event, Comar agreed to loan at an interest rate of 10% per annum, up to 80% of eligible A/R that met certain criteria specified in the agreements. [Agreements, Art. 3(f).]

18. When payment of such A/R were received by Comar, Comar's management fee, and the principal and interest owing on the A/R loan were deducted by Comar and the balance remitted to Owners. [Agreements, Art. 3(f).]

19. The Agreements also required that Comar present an invoice to the Marine Logistics Entities and allow ten days for payment of any outstanding Owner Expenses that were not funded either through cash on hand and/or A/R loans. [Agreements, Art. 4(i).]

20. The Agreements required each Owner to establish and maintain a checking account in the name of the Owners at the Patterson State Bank ("Owners' Account"), and to maintain a minimum balance of $25,000.00, which Owners were required to replenish upon written request by Comar. [Agreements, Art. 4(j).]

21. The Owners' Account was used to pay all vessel operating expenses incurred under the Agreements. [Agreement, Art. 4(j).]

22. The Agreements provided that if Owners' Account fell below the required minimum balance and owners failed to provide additional funding within five (5) days of Comar's request, then Comar had the sole option to either (i) advance the necessary funds at an interest rate of 1.5% per month and deduct said funds plus accrued interest from any pending or future amounts due to Owner; or (ii) declare Owner to be immediately in default of the Agreement and, if such default was not timely cured, terminate the Agreement. [Agreement, Art. 4(k).]

23. The Agreements required that the vessels be painted and maintained in the Comar color scheme with Comar emblems and the Comar vessel name at the expense of the Owner, and the vessels were maintained in such color scheme and with such emblems and names throughout Comar's operation of the Vessels. [Agreement, Art. 4(m).]

24. In the Agreements, Owners acknowledged that Comar, either directly or through its affiliated companies or designees, may perform other services (including without limitation maintenance and repair services), and may supply materials, equipment and supplies (including without limitation repair and replacement of parts, material, equipment and supplies) as are necessary for the operation of Owners' vessels, and that such services, materials, equipment and supplies shall be deemed an expense for Owners' account. [Agreement, Art. 3.]

25. In the Agreements, Comar agreed to use "its best efforts" to obtain charters for the Vessels and keep the Vessels under charter throughout the term of the Agreements; and to use "all reasonable efforts" to manage and operate the Vessels within the terms, conditions and limitations of the agreements and to comply with the terms and conditions of any time charter to which the Vessels became subject during the term of the Agreements. [Agreements, Art. 3(a).]

26. The Agreements gave Comar sole responsibility and sole decision-making authority for the solicitation, bidding, setting charter rates, selecting customers, and negotiation of charters. [Agreements, Art. 3(a).]

27. In the Agreements, Owners acknowledged that Comar performed vessel management services for others and may be in competition with the Owners' vessels. [Agreements, Art. 3(a).]

28. The Agreements provided that Owners' vessels would receive preferential treatment as to any potential charters over a vessel subchartered or brokered by Comar. [Agreements, Art. 11(f).]

29. This preferential treatment did not apply to other Comar managed vessels or Comar or Comar affiliate owned vessels, which vessels, which, along with Owner's vessel, would

4

receive equal treatment with respect to any charters, subject to customer requirements and availability. [Agreements, Art. 11(f).]

30. This equal treatment policy was stated in the Agreements to be generally a first in, first out policy, meaning that a suitable vessel for the job that has been out of work the longest will be the first vessel put back to work, absent any overriding customer requirements. [Agreements, Art. 11(f).]

31. In the Agreements, Owners acknowledged and recognized that Comar did not represent or warrant that the Owners' vessels would be chartered for any specific period or at any specific day rate during the term of the agreements and that the market for offshore crewboats is cyclical in nature. [Agreements, Art. 3(a).]

32. In the Agreements, Owners acknowledged and recognized that Comar made no warranty, representation or guarantee of any kind regarding future utilization or day rates for Owners' vessel. [Agreements, Art. 3(a).]

33. Article 17 of the Agreements provides:

> ARTICLE 17. ATTORNEYS' FEES AND EXPENSES. If either party engages an attorney to enforce its rights under this Agreement and/or institutes litigation to enforce such rights, the losing Party (as determined by the court) shall pay all attorneys' fees and expenses, court costs, costs of vessel arrest and seizure incurred by the other Party.

34. Lirette testified that at the time he and St. Amand entered into the Agreements, he had experience in engineering and managing production services in the oil and gas industry, including the hiring of vessels to serve offshore oil and gas platforms.    [Tr. Vol. II, Testimony of Lirette, p. 325, lines 6-17; p. 400, lines 14-22.

35. St. Amand testified that he had been in oil and gas offshore work for 20 years and was presently a consultant as an operation manager to independent oil and gas companies and that he worked with owners of vessels and the salespeople. Tr. Vol. II, Testimony of St. Amand, p. 429, line 20 – p. 430, line 4; p. 436, lines 14-15; p. 439, lines 19-20; p. 451, lines 18-20; p. 455, line 25 – p. 456, line 2.]

36. Glynn Haines ("Haines"), the CEO of Comar, testified that Comar's business objective in selling the CONQUEROR, RAIDER and ENFORCER was to buy and build a fleet of larger classes of vessels to keep up with the deep water oil field; but to continue managing, marketing, operating and maintaining the Vessels in order to recover Comar's investments in spare components that were unique to these Vessels and to keep its personnel working so they would be available to work on Comar's new vessels when they were delivered. [Tr. Vol. III, Testimony of Haines, p. 488, lines 6-18; p. 491, line 21 – p. 492, line 17; p. 493, line 25 – p. 494, line 11.]

5

37. Haines testified that Comar's business objectives were discussed with Lirette and St. Amand and they understood them prior to the purchase. [Tr. Vol. III, Testimony of Haines, p. 489, lines 19-24; p. 490, lines 13-19; p. 494, lines 15-23.]

38. Haines testified that if the Agreements had been canceled early, Comar "would have been stuck with a lot of spares that I would have preferred to have sold with the boat" in addition to losing "almost half a fleet and a complete class of boats at one time." [Tr. Vol. III, Testimony of Haines, p. 492, lines 6-17.]

39. Haines testified that he "would not have sold the vessels without the termination fee provisions," in part because he was concerned about being able to keep his vessel crew while he was building bigger vessels for the fleet. [Tr. Vol. III, Testimony of Haines, p. 572, lines 13-21.]

40. Lirette testified that prior to signing the 2007 Agreements, he and St. Amand were provided drafts of the Agreements as well as the Purchase and Sale Agreements for the Vessels which they gave to their attorney, Emile Joseph, for review. [Exhibits 41 and 42; Tr. Vol. II, Testimony of Lirette, p. 372, lines 6-25 p. 373, lines 1-15.]

41. Almost immediately after execution of the 2007 Agreements and during the first year and a half, St. Amand began sending Comar emails and calling Haines "pretty regularly" complaining about the marketing of the Vessels and Comar's lack of sales efforts. [Exh. 53, 57, 60, 68]; [Tr. Vol. III, Testimony of Haines, p. 501, ll. 3-8.].

42. The record contains numerous examples of such emails, including Comar's responses, sent during the period October, 2007 – March, 2008. [*See, e.g.*, Exhibits 53, 57, 60, 66 and 68.]

43. Through these email exchanges, Comar explicitly stated to Lirette and St. Amand that market conditions in the Gulf of Mexico were deteriorating and Comar had no plans to hire a dedicated salesperson as it did not believe it was appropriate to do so. [*See* Exhibits 57 and 53.]

44. Comar's email of October 10, 2007 [Exhibit 53] set out Comar's view of market conditions and approach to marketing of vessels, and recommended that Lirette and St. Amand seek to reduce the debt service burden on their companies to put them in a better position to weather the deteriorating market conditions. [Tr. Vol. III, Testimony of Haines, p. 501, lines 22-25 and p. 502, lines 1-2, p. 503, lines 14-24.]

45. Comar's email of October 10, 2007 stated that Comar set up the "sub rent program" to encourage St. Amand and Lirette to save brokerage fees on the Vessels and allow them to earn brokerage fees on other Comar boats or outside sub rents, however, "not much has taken place with this." [Exhibit 53.]

46. In several emails, St. Amand indicated that he and Lirette made contact with sales people on their own in order to market the Vessels. [Exhibits 53, 57, 61, 81.]

47. In a March 5, 2008 email, St. Amand  suggested that Comar stop operating the Vessels so he could allow one of several other companies he said were calling him "for the contract of these boats" to operate them instead, prompting Haines to reply: "based on chris's [sic] comments below, it is probably in everyone's best interest that we have a meeting ASAP to discuss how to best sever our business relationship before we have a complete falling out. Let me know when you guys can meet." [Exhibit 66.]

48. The Agenda of the March 28, 2008 Gator Monthly Meeting included, among other things, financial reporting, each Vessels' job and sales status and marketing updates. [Exhibit 70.]

49. St. Amand testified that at the time of the acquisition of the Vessels in 2007, he and Lirette expected that Comar had a salesman to market the Vessels. [Tr. Vol. II, Testimony of St. Amand, p. 438, lines 1- 4.]

50. Robert A. Varnum, testified that he worked for Comar mostly as a sales representative from about 1968 until he retired in January 2007 and formed his own company where he began placing Comar's vessel for a commission or by sub-renting.[1] [Tr. Vol. II, Testimony of Varnum, p. 589, lines 3-20, p. 592, lines 4-9.]

51. Varnum testified that he did not train anyone to replace him before he retired and he was not aware of anyone taking his position.  [Tr. Vol. II, Testimony of Varnum, p. 591, lines 14-19, p. 592, lines 10-17.]

52. John Mouisset, a boat broker for ten years, testified that between 2007 and 2009 he called on Comar to rent the M/V MARAUDER on two occasions and was told the vessel was not available but he did not ask whether or not the MARAUDER was already on charter.  [Tr. Vol. III, Testimony of Mouisset, pp. 605, lines 18-25 - 607, lines 1- 23, pp. 608, lines 22-25 – 609, lines 1-3.]

53. John Oliver, who worked as a logistics manager and hired 5 to 10 boats a week between 2007 and 2009, testified that he had rented vessels from Comar "several times."  He found the only difference with the way Comar marketed its boats from other companies was in "frequency," in that Comar met with him in his office three or four times at the most. [Tr. Testimony of Oliver taken 03/08/2013, p. 12, lines 5-11, pp. 15, lines 19-22 – 17, line 1.]

54. In May of 2008, Comar reached an agreement with the Marine Logistics Entities to sell the M/V MARAUDER for $975,000.00, concurrent with a new three-year management agreement on the Marauder and three-year extensions of the Agreements on the other Vessels. [Exhibit 79.]

---

[1] The Court notes that Varnam's memory was somewhat unclear as to when he actually retired from Comar, but he did agree that his retirement was within a few weeks of the formation of his consulting company "Varnam Sales & Consulting." [Tr. Vol. III, p. 597, lines 11-14.]  The Court takes judicial notice of the fact that the Louisiana Secretary of State's records indicate that Varnam Sales & Consulting was formed on February 16, 2006.

55.  Haines testified that he believed he was selling the MARAUDER at a price below the market value of the Vessel. [Tr. Vol. III, Testimony of Haines, p. 511, lines 3-15.]

56.  The May 21, 2008 sale was initially financed by Comar via a loan for 10% down payment against Gator A/R and financing of the balance at 8%, with monthly interest only payments and the loan becoming due in full in 6 months.

57.  In August of 2008, the Marine Logistics Entities borrowed $1,470,000 from Allegiance Bank Texas ("Allegiance") secured by the MARAUDER and did not address the term or payments of the notes on the other three vessels. [Exhibit 315; Tr. Vol. II, Testimony of Lirette, p. 404, lines 5-25.]

58.  Lirette testified it was his and St. Amand's decision to leverage the MARAUDER to the extent it did and that Comar had no involvement in the decision. [Id.]

59.  Lirette testified that he was not forced to purchase the MARAUDER but did so of his own volition, knowing that it was a condition of the sale that Owners enter into an Agreement for the MARAUDER and extended Agreements for the other three Vessels, and that he could have simply walked away from the offer to purchase the MARAUDER but instead chose to enter into the Purchase and Sale Agreement and enter into the Agreements. [Tr. Vol. II, Testimony of Lirette, p. 401, line 22 – p. 402, line 16, p. 403, lines 9-14; p. 561, lines 15-18.]

60.  Haines testified that he had advised the Owners, in light of the downturn in the market, to refinance their existing Vessels with the MARAUDER in order to reduce the note. [Tr. Vol. III, Testimony of Haines, p. 503, lines , pp. 509, lines 21-25 – 510, lines 1-5.]

61.  Haines testified and the record indicates that towards the end of 2008, oilfield activity in the Gulf of Mexico began to deteriorate, resulting in a negative impact on vessel utilization and vessel day rates of Comar's entire fleet, including Owners' Vessel. [Tr. Vol. II, Testimony of Lirette, p. 400, lines 3-9; Tr. Vol. III, Testimony of Haines, p. 502, lines 6-22; Exh. 53.]

62.  The utilization rate for Owners' Vessels in 2007 was approximately 84%; in 2008 was 81 % and in 2009 up to the date of termination declined to 45%. [Exhibits 12, 294.]

63.  The combined utilization rates for the Comar-affiliated companies' vessels  showed similar declines of approximately 86% in 2007, 75% in 2008, and 35% in 2009. [Exhibit 298.]

64.  The emails and communications between Comar and the Owners from October, 2007 to March, 2008 establish that, prior to executing the Agreements Lirette and St. Amand were fully advised of the deteriorating market conditions in the Gulf of Mexico and Comar's approach to marketing, including its staffing of marketing efforts.

65.  Nonetheless, the Owners executed the Agreements at issue without a provision requiring Comar to maintain any particular level of staffing for its marketing efforts or hire a dedicated salesperson.

66. The Court finds that the fact that these communications all took place before Defendants entered into the Agreements at issue establish that the Owner's complains about Comar's performance of the contract cannot reasonably be interpreted as rising to the level of material breaches of the Agreements.

67. The Court finds that had Owners believed that Comar was not using its "best efforts" to market the Vessels and was in material breach of this obligation, it would not be rational for Owners to enter into extensions of the 2007 Agreements and also purchase another vessel and place it under the same management agreement with Comar. Yet that is exactly what they did.

68. Haines testified that shortly after the monthly meeting on August 10, 2009, Owners informed him that they wanted to take the Vessels from Comar and they discussed how to figure out the amount of money they owed Comar. [Tr. Vol. III, Testimony of Haines, p. 521, lines 3-14.

69. On August 13, 2009, Haines sent Lirette an email setting forth Comar's estimates of what would be due Comar under the Agreements assuming an August 31, 2009 termination date. [Exhibit 274; Tr. Vol. III, Testimony of Haines, p. 523, lines 1-5.]

70. St. Amand testified that when he received Comar's estimates of what would be due under the Agreements (Exhibit 274) he knew the amounts were not accurate because he had the August 5, 2009 A/R recap from Theresa Levergne, head of Comar's accounting department, which showed they were $158,000 in the black in addition to the other amounts Comar owed them like insurance credits. [Tr. Vol. II, Testimony of St. Amand, p. 460, lines 2- 20; pp. 461, lines 24, - 462, line 7].

71. On August 14, 2009, Lirette notified Haines by email that the Owners intended to terminate the Agreements effective immediately as they had signed a management agreement with Lafayette Workboat Rentals. Lirette testified that he did not communicate to Haines that Owners believed Comar was in breach of the Agreements. [Exhibit 277, Tr. Vol. II, Testimony of Lirette, p. 317, lines 3-25 – 318, lines 1-3.]

72. Lirette testified that the management agreement with Lafayette Workboat Rentals executed after they left Comar was for operations and the company did not have a dedicated salesperson, so they signed a brokerage contract with Kilgore Marine. [Tr. Vol. II, Testimony of Lirette, pp. 395, line 17, - 396, line 11.]

73. The Court finds that Comar properly calculated the termination fees in accordance with the formula set forth in the Agreements. [*Id.*, Exhibit 12.]

74. Identical agreements between Comar and other third-party vessel owners expressly required consideration of foregoing non-working days in the calculation of the termination fees. [Exhibit 299, Bates No. CMC 16744; CMC 16761.]

75. The termination fee provisions take the artificially inflated baseline figure for "average gross daily charter hire" - which does not account for prior non-working days - and then multiply that inflated number by every single day of the remaining term of the Agreements, without regard to prospective non-working days.[2]  Thus, the final baseline figure underlying calculation of the termination fees - which is derived by multiplying an artificially inflated average gross daily charter hire figure by an artificially inflated and all-inclusive number of prospective working days - necessarily results in an artificially inflated baseline number. Thus, the Court rejects Comar's contention that an arbitrary 50% discount factor somehow cures the inherently unrealistic and non-approximate inflated baseline calculations.

76. The Court finds that the calculations underlying the Termination Fee provisions result in artificially inflated numbers and calculations which do not approximate any actual potential losses because they do not account for foregoing non-working days and do not account for prospective non-working days, and are therefore penal provisions.

77. The Court finds that the penal nature of the Article 8 calculations is demonstrated by the following hypothetical:  if the Agreements were terminated after a single day charter for one of the Vessels, Article 8 would allow that single-day charter rate to be multiplied by the entire 1,094 remaining days of the three-year Agreements, without any regard to actual utilization or charter hire.  Likewise, given the cross-default provision at Article 11(d) of the Agreements, all four of the Agreements could be deemed terminated by Comar after this one day of work for only one of the four vessels.

78. Tizzard testified that he was not aware of any remedy in the Agreements for the Owners in the event COMAR breached the Agreements.  [Tr. Vol. II, Testimony of Tizzard, p. 255, lines 9-11.]

79. Identical agreements between Comar and other third-party vessel owners did include bilateral termination fee provisions to protect both sides. [Exhibit 299.]

80. The Court finds that the fact that there is no corresponding provision requiring Comar to pay termination fees in the event of its own unilateral termination of the Agreements further underscores the penal nature of the Termination Fees.

81. The Court finds that another indicator of the penal nature of the termination fee provisions is the fact that if the Owners decided to sell the Vessels to a third party (which would require appointment of Comar as the exclusive broker for the sale) - and if Comar at its own option chose not to continue managing the vessels for that third party - the Owners would still be liable for termination fees.  In other words, if the Marine Logistics Entities wanted to sell a vessel, they were forced to appoint Comar to broker the sale, and then if Comar decided not to continue managing the vessel after the sale it brokered, Comar could still charge

---

[2] It is not disputed that none of the four vessels operated by Comar under the Agreements ever worked every day of the year, but rather, all four worked significantly fewer than 365 days in each year the Agreements were in effect.

termination fees to the Marine Logistics Entities under the Agreements. [Exhibit 1, Agreements, Articles 7 and 8.]

82. Identical agreements between Comar and other third-party vessel owners did not include this comprehensive mandatory broker appointment/option to continue agreement/termination fee provision.  [Exhibit 299, Bates No. CMC 16744 (Article 7 does not provide mandatory broker appointment); CMC 16759 (Article 7 requires appointment of Comar only as non-exclusive broker); CMC 16794 (Article 7 does not provide mandatory broker appointment).]

83. Tizzard testified that the 10 percent monthly management fee, which includes mostly "G&A" (General and Administrative) as well as some profit, would be decreased if a Comar contract was terminated.  [Trial Testimony of Charles Tizzard, Trial Transcript Vol. II, p. 253, ll. 7-14.]

84. The Court further finds that the termination fee provisions are penal in nature because they do not account for the fact that if the Agreements are terminated, Comar necessarily will not be incurring any G&A expenses with respect to the Vessels after termination.  Thus, to the extent Comar's 10 percent/$3,000 monthly management fee was intended to cover G&A and profit - with most of that management fee attributable to G&A expenses (as per Tizzard's trial testimony) - the termination provisions do not provide any reasonable approximation of actual potential losses.

85. Haines testified that Comar did not have any vessels in competition (i.e. in the same 120' crewboat class) with the Vessels, and therefore, Comar had no intercompany competition - which was contrary to Comar's position during motion practice on the termination fees wherein Comar argued that, "[t]he management agreements were bargained for in connection with Comar's sale of the vessels to Owners for the very purpose of preventing future competition from these vessels." (Rec. Doc. 230, p.4). [Tr. Vol. III, Testimony of Haines, p. 560 lines 16-18; p. 573, lines 21-23.]

86. The fact that the termination provisions were also included in the *original* 2007 Agreements for the RAIDER, CONQUEROR, and ENFORCER, none of which were sold at any kind of below-market value, also conflicts with Comar's argument during motion practice that the termination fee provisions were included in the Agreement in connection with the sale price of the M/V MARAUDER (Rec. Doc. 236, p.4).

87. Finally, Haines testified that the termination fee provisions were included in the original 2007 Agreements in order to protect Comar and guarantee revenue to fund a contemplated future fleet build-out for larger vessels (which ultimately never occurred).  [Tr. Vol. III, Testimony of Haines, pp. 572, line 15, - 573, line 10.]

88. The Court finds that Comar's constantly changing explanations and/or justifications for including the termination fee provisions in the Agreements underscore their penal nature.

89. Haines testified that on August 18, 2009, Comar secured the arrest of the Vessels after seeking advice of legal counsel that the outstanding Owner expenses and A/R loans due from

11

Owners at the time of arrest gave rise to a maritime lien against the Vessels and entitled Comar to arrest the Vessels. [Exhibit 24, Tr. Vol. III, Testimony of Haines, p. 544, lines 7-11.]

90. Haines testified that he had what was "in [his] opinion . . . [a] detailed" discussion with counsel prior to making the decision to arrest the Gator Vessels. However, in his deposition two weeks before trial, he testified that he "[didn't] recall any specific discussion about that except we told them what had happened and what was going on, and asked them if I could arrest vessels, and they said yes[;] [i]t wasn't like a long, drawn-out discussion or anything." [Tr. Vol. III, Testimony of Haines, p. 544, lines 4-25.]

91. The Court previously ruled in this proceeding that Comar had no *prima facie* right to a lien against the Vessels insofar as Comar was a joint venturer of the Marine Logistics Entities. [Rec. Docs. 158 and 252.]

92. Haines testified that his legal counsel instructed him to allow the crew members acting on behalf of Owners to take the Vessels from Comar's dock and cooperated in the re-delivery of the other Vessels that were returning from jobs at the time. [Tr. Vol. III, Testimony of Haines, p. 525, lines 9-11, p. 526, lines 15-16.]

93. Haines testified that Comar filed an amendment to the arrest complaint for failure to repaint the Vessels two months after they were arrested eventhough the Vessels were at a shipyard being painted when he had them arrested. [Tr. Vol. III, Testimony of Haines, pp. 536, line 15, - 537, line 5.]

94. Charles E. Tizzard, President of Comar, testified that the figures in the arrest complaint, in support of the maritime lien, represented the amounts owed by Owners on the date the complaint was filed, as follows: M/V CONQUEROR - $47,996.97, M/V ENFORCER - $40,851.66, M/V RAIDER - $6,839.72, M/V MARAUDER - $136,800.45; and that the Termination Fees were as follows: M/V CONQUEROR - $138,762.40, M/V ENFORCER - $132,630.26, M/V RAIDER $137,412.60, M/V MARAUDER - $128,441.60 [Tr. Vol. II, Testimony of Tizzard, p. 205, lines 15-pp. 207, line 19.]

95. After the arrest of the Vessels, Levergne sent an email to Haines dated August 27, 2009, indicating continued calculation of amounts owed by the Marine Logistics Entities. [Exhibit 284.]

96. After the arrest of the Vessels, Haines sent an email to Levergne dated September 3, 2008, stating that Comar's lawyers "need a breakdown of what Gator [i.e. the Marine Logistics Entities] would owe us if we collect all receivables." [Exhibit 283.]

97. Haines testified that he did not recall being provided with the invoices which Owners owed to Comar but if it happened it would have been after the arrest of the Vessels. [Tr. Vol. III, Testimony of Haines, p. 552, lines 6-25.]

98. Tizzard testified that he "was involved in the team" that prepared the calculations of the amounts claimed in Comar's original Complaint and that he had spoken with Comar's trial counsel; however in his deposition a few weeks earlier he stated that that he could not recall and/or had essentially no involvement at all with the pre-arrest calculations (because Theresa Levergne handled all of it) and that he never talked to any of Comar's legal counsel regarding the issue of arresting the vessels. [Tr. Vol. II, pp. 196-197, p. 230, lines 10-25, -231, lines 1-12.]

99. Tizzard testified that at the time of the arrest, Comar did not know how much in Accounts Payable was owed on the Vessels because they "didn't necessarily have all the invoices in," but Comar would have had the majority of them within 30 days. [Tr. Vol. II, p. 237, lines 4-20.]

100. Tizzard initially testified that the A/R underlying the Vessels' loans was "uncertain [because] you're not sure you're going to collect them," however, he later testified in response to the Court's questions that he had "a reasonable confidence that [he would] get paid on these accounts receivables." [Tr. Vol. II, pp. 279, lines 3-6, p. 285, lines 19-22.]

101. Tizzard testified that the majority of the Vessels' A/R were paid to Comar by the end of September, 2009. [Tr. Vol. II, p. 238, lines 8-15, Exhibit 37.]

102. Haines testified that "[t]he decision was made to arrest the vessels knowing there was outstanding A/R out there." [Tr. Vol. III, Testimony of Haines, p. 555, lines 13-17.]

103. Tizzard testified that he understood that once the Vessels were seized they would immediately be unable to make any money being rented. [Tr. Vol. II, p. 288, lines 10-22.]

104. Haines testified that he understood that once he seized the Vessels they were shut down and Owners couldn't operate or pay their bank notes and that the uncollected A/R would lower or eliminate Owners debt to Comar, but he was more concerned that they were in a "free-fall market." [Tr. Vol. III, pp. 583, lines 3-18.]

105. Haines testified that he knew that most of the outstanding A/R, if not all, were owed by oil companies or brokers Comar had worked with before and had never had any problems. [Tr. Vol. III, pp. 583, lines 20-25, – 584, lines 1-4.]

106. Tizzard testified at length that all the outstanding A/R as of the August 18, 2009 date of the arrest of the Vessels was owed by companies with whom Comar had previously dealt, who regularly paid their invoices and which Comar expected to be paid in full. [Tr. Vol. II, testimony of Tizzard, p. 281, line – p. 285, line 22.]

107. Levergne testified that each of the Owner accounts for the M/V CONQUEROR, the M/V ENFORCER and the M/V MARAUDER had been fully funded either by A/R loans or cash infusions as of July 31, 2009 and that the M/V RAIDER was fully funded through July 15, 2009. [Tr. Vol. I, Testimony of Levergne, pp. 107, line 24, - 109, line 25.]

108. Levergne testified that the Vessels' July 15, 2009 cash positions reflected all A/P ("accounts payable") due as of as of July 15, 2009, but it was possible some vendor's had not been paid. [Tr. Vol. I, Testimony of Levergne, pp. 108, line 20, -109, line 18.]

109. Levergne testified that, accordingly to a document prepared by Comar's attorney for trial, if Comar had collected and applied to Owners' accounts all A/R arising from Comar's operation of the Vessels under the Agreements as of September 1, 2009, without considering the termination fees, Comar would have owed Owners over $21,000. [Exhibit 300, Tr. Vol. I, Testimony of Theresa Levergne, pp. 186, line 12, - 187, line 19, p. 188, lines 13-21.]

110. Haines testified that had he known that at the time of the arrest Comar's A/R from renting the Vessels would be over $20,000.00 more than what Owners owed Comar minus the termination fees, he would have still gone forward with the seizure of the Vessels because he didn't know legally what he could have done related to freezing the Vessels' accounts. [Tr. Vol. III, pp. 582, line 6, – 583, line 2.]

111. Article 4(j) of the Agreements provides that, "COMAR shall have signature authority on the [Owner's] account" which gave Comar authority over the Vessels' accounts. [Exhibit 1, Article 4(j).]

112. Based on the inconsistencies in his deposition and trial testimony, the Court finds that Haines' testimony related to Comar's arrest of the Vessels is not credible.

113. Based on the inconsistencies in his deposition and trial testimony, the Court finds that Tizzard's testimony related to Comar's arrest of the Vessels is not credible.

114. The M/V MARAUDER was under seizure for 35 days, and the remaining three Vessels for 37 days, before Owners secured their release from arrest. [Rec. Docs. 65 and 66.]

115. As of the date of trial, the only amounts Comar contended Owners were liable to pay were the Termination Fees. [Tr. Vol. II, Testimony of Tizzard, p. 215, line 12 – p. 222, line 13; Exhibit 15.]

116. Haines testified that the Termination Fees were not for any services that Comar actually rendered to the Vessels. [Tr. Vol. III, Testimony of Haines, p. 535, lines 13-19.

117. The Court finds that Comar did not provide its lawyers with full and accurate information regarding how much A/P the Marine Logistics Entities actually owed or how much A/R was outstanding on the Vessels prior to arresting the Vessels, and therefore, Comar is not entitled to the advice-of-counsel defense.

118. The Court finds that, at the time of arrest, because Comar knew (through Haines and Tizzard) that the outstanding A/R would be collected, and that Comar would ultimately owe the Marine Logistics Entities money, Comar lacked probable cause to arrest the Vessels.

119. The Court finds that Comar acted in bad faith and with malice by arresting the Vessels before it made a final, complete assessment of how much was owed by the Marine Logistics Entities from both the A/P and an A/R perspective, at which time it would have been able to reasonably and fairly assess its good faith options.

120. The Court finds that Comar amended the claims supporting the arrest of the Vessels two weeks after the arrest to include allegations that the Marine Logistics Entities failed to repaint the Vessels as required by the Agreements, when in fact Comar arrested the Vessels while they were in the shipyard preparing to be repainted and it later dropped the claim.

121. The Court finds that the estimates of amounts owed which Haines provided to Lirette on August 13, 2009 (Exhibit 274), were not provided in good faith as required by Article 8(f) of the Agreements in that they included amounts previously funded by A/R loans and did not include any outstanding A/R, and were therefore not actually due to Comar.

122. The Court finds that Comar included in the maritime liens in support of arresting the Vessels, the termination fees for each of the Vessels which were not related to any services actually rendered to the Vessels.

123. The Owners paid the bond in order to secure the M/V MARAUDER's release from arrest because Allegiance Bank loaned them some of the money for the bond. [Tr. Vol. II, Testimony of Lirette, p. 365, lines 8-25.]

124. Because Chase Bank was not willing to loan Owners the money to put up the bonds for the M/V CONQUEROR, the M/V ENFORCER, and the M/V RAIDER, and the Owners did not have enough money to pay bonds on all the boats, they were forced to place them into bankruptcy. [Tr. Vol. II, Testimony of Lirette, p. 365, lines 8-25, p. 397, lines 16 -21.]

125. The M/V RAIDER had been laid up prior to Owners' termination of the Agreement because the Owners decided not to spend the money to repair the engine. The boat was eventually repaired and put to work and was sold out of bankruptcy. [Tr. Vol. II, Testimony of Lirette, p. 366, line 22, - 367, line 8, 23-25.]

126. Lirette and St. Amand tried to refinance the vessels, but no banks would agree to refinance because of the three boats being in bankruptcy. [Tr. Vol. II, Testimony of Lirette, p. 367, line 16-22.]

127. Lirette testified that the Vessels had received "quite a bit of work" from Kilgore Marine and that since the day they were arrested he and St. Amand had an agreement with Kilgore Marine for a production job for the M/V CONQUEROR. [Tr. Vol. II, Testimony of Lirette, pp. 361, lines 14, - 362, line 15.]

128. St. Amand testified that there was no evidence documenting the Vessels' work lined up at the time of or after the arrest because the boat rental business is so dynamic and spur-of-the-moment that there is not time to complete paperwork for the work to be done. [Tr. Vol. II, Testimony of St. Amand, pp. 469, line 6, - 471, line 14.]

15

129. Article 20 in the Agreements provides as follows:

> PRINCIPAL OF OWNER GUARANTY.  The principal of the Owner, whose name is set forth below, hereby unconditionally guarantees the prompt and full payment of all obligations owed by Owner under this Agreement, including, without limitation, all Owner Expenses, the Management Fee and all other obligations owed by Owner (including the surviving indemnity obligations) owed under this Agreement.

130. The signature page of the Agreements show Lirette and St. Amand signing in signature blocks entitled "Guarantors of this Agreement" with no indication that they were signing in any representative capacity.

131. Article 20 and the signature block entitled "Guarantors of this Agreement" in the Agreements clearly and unequivocally indicate that Lirette and St. Amand signed the Agreements in their individual capacity as personal guarantors of the Owners' obligations and express the intent of Lirette and St. Amand to personally guarantee the obligations of Owners under the Agreements.

132. The Court finds Lirette's and St. Amand's testimony that they did not believe they were personally guarantying the Agreements to be incredible.

*Conclusions of Law*

133. Every maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement. *See, KAI Enterprises, L.L.C. v. Boh Bros. Const. Co., L.L.C.,* 731 F.Supp.2d 568, 582 (E.D.La.,2010); *RESTATEMENT OF CONTRACTS §* 205.

134. Under the implied covenant of good faith and fair dealing, "neither party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement." *F.W.F., Inc. v. Detroit Diesel Corp.,* 494 F.Supp.2d 1342, 1359 (S.D.Fla., 2007).

135. Breach of the implied covenant of good faith and fair dealing has been found "[i]f the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party," *Allworth v. Howard University,* 890 F.2d 194, 201(D.C., 2006), and by "violat[ing] standards of decency, fairness or reasonableness," or "engag[ing] in any arbitrary or capricious action" towards the other party. *Gaufacq v. EDF, Inc.,* 601 F.3d 565, 580 (D.C. Cir., 2010) (citing *Allworth* at 201-02).

136. "[T]he obligation of good faith and fair dealing is not breached merely by the failure to perform a particular obligation.  A mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute a breach of good faith." *Dufrene v. Browning-Ferris, Inc.,* 1997 WL 587765, 2 (E.D.La.,1997)(internal citations omitted).

137. A contract that is prepared by the party with greater bargaining power and presented to the other party on a take-it-or-leave-it basis is known as a contract of adhesion and is generally found to be procedurally unconscionable. *Alexander v. Anthony Intern.*, L.P., 341 F.3d 156, 165 (3d Cir.2003)(citations omitted).

138. "[T]he burden of proving [] unconscionability lies with the party challenging the contract provision." *Parilla v. IAP Worldwide Servs., VI, Inc.,* 368 F.3d 269, 277 (3d Cir.2004) (internal citations omitted)).

139. Because there is "no clearly articulated judicially established standard regarding the meaning of 'unconscionability' . . . within federal admiralty law[,]" admiralty courts generally apply state law on the matter. *Lake Erie Towing v. Walter*, 1:07-CV-02312, 2007 WL 2907496 (N.D. Ohio Oct. 3, 2007).

140. In order to be invalidated as unconscionable under Louisiana law, a contract "must possess features of both adhesionary formation and unduly harsh substance." *Lafleur v. Law Offices of Anthony G. Buzbee, P.C.*, 2006-0466 (La. App. 1 Cir. 3/23/07); 960 So. 2d 105, 112.

141. "A contract of adhesion is a standard contract, usually in printed form, prepared by a party of superior bargaining power for adherence or rejection by the weaker party. Often in small print, these contracts sometimes raise a question as to whether the weaker party actually consented to the terms." *Id.*

142. "Factors bearing on whether an adhesion contract is unconscionable and, therefore, unenforceable include the relative sophistication and education levels of the parties, the lettering size of the contract, and the clarity or ambiguity of the language in question." *Reimonenq v. Foti*, 72 F.3d 472, 477 (5th Cir. 1996).

143. The Agreements in this case were commercial undertakings entered into by sophisticated businesspersons. *See, Horizon Petroleum Co. v. Barges Dixie 162,234 & 236*, 753 F.2d 382, 385 (5th Cir. 1985).

144. Both Lirette and St. Amand are sophisticated businesspersons with extensive experience working as offshore logistics managers in charge of coordinating production services and equipment needs in the oil and gas industry and they had negotiated numerous complex contracts in their work prior to entering the 2008 Agreements with Comar. [Tr. Vol. II, Testimony of Lirette, p. 324, lines 9-10, p. 371, lines 11-17, p. 400, lines 10-20; Tr. Vol. II, Testimony of St. Amand, p. 429, line 19 – p. 430, line 4.]

145. Owners had ample time to review the contracts and every opportunity to retain an attorney for advice. St. Amand did in fact send the 2007 Agreements (which are virtually identical to the Agreements at issue and contain an identical Termination Fee provision) over to an attorney for review. [Tr. Vol. II, Testimony of Lirette, p. 373, lines 5-15; *see also* Exhibit 41.] St. Amand and Lirette had the necessary business sophistication to know that they could have consulted an attorney in connection with the execution of the Agreements, had they wished to do so. They simply chose not to do so.

146. "[W]hen the employee 'could have avoided the clause by simply rejecting the employment with the defendant,' the requisite difference in bargaining position was lacking." *Neal v. Nabors Drilling USA, LP*, 2011 WL 3584752 (W.D. La. Aug. 15, 2011) (finding that arbitration agreement which provided for unilateral cancelation was not unconscionable).

147. Louisiana "courts generally have not acted to relieve parties of bad bargains freely entered into, no matter how harsh." *Andry v. New Orleans Saints*, 820 So. 2d 602, 603 (La. Ct. App. 2002) *writ denied*, 828 So. 2d 1120 (La. 2002) (finding that a contractual provision that required season ticket holders to purchase an extra ticket was not so burdensome or harsh as to require the court to set it aside as unconscionable).

148. The Court finds the fact that the Owners agreed to enter into the same Agreements a second time indicates their willingness and consent to be bound by the contractual terms.

149. Maritime law controls the substantive law of maritime seizures. *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir.1992), citing *Frontera Fruit Co. V. Dowling*, 91 F.2d 293, 297 (5th Cri. 1937).

150. "[A]dvice of competent counsel, honestly sought and acted upon in good faith is alone a complete defense to an action for malicious prosecution." *Id.* ("The reasons for the award of damages are analogous to those in cases of malicious prosecution.").

151. "[F]or the advice of counsel to serve as a defense, it not only must be given after a full disclosure of all the facts of which the one causing the arrest to be made had knowledge, after such person has exercised reasonable diligence to ascertain them, but the advice must have been acted upon honestly and in good faith." *Mullen v. Gause*, 109 So. 2d 31 (La. 1926).

152. "A maritime lien is a special property right in a vessel that 'developed as a necessary incident of the operation of vessels.' The lien secures creditors who provide 'supplies which are necessary to keep the ship going.' It 'arises in favor of the creditor by operation of law... and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds.'" *Silver Star Enterprises, Inc. v. SARAMACCA M/V*, 82 F.3d 666, 668 (5th Cir. 1996) (internal citations omitted).

153. An owner, part owner or joint venturer cannot hold a maritime lien. *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1208 (5th Cir.1978).

154. The "joint venture" exception to maritime liens is based on "the equitable notion that those who share responsibility for incurring the debts of the vessel ought not to be reimbursed out of the vessels' proceeds to the detriment of other lienholders." *Cantieri Navali Riuniti v. M/V Skyptron*, 621 F. Supp. 171, 186 (W.D. La. 1985).

155. Based on the relationship between Comar and the Marine Logistics Entities as evidenced by the Agreements at issue, the Court previously held that the parties were engaged in a joint

venture and Comar was precluded from obtaining a lien on the Vessels. [Rec. Docs. 158 and 251, 252.]

156. "To succeed on a claim for wrongful arrest of a vessel, the claimant must establish that the seizure was (1) pursuant to an invalid maritime lien and (2) committed with bad faith, malice, or gross negligence. Bad faith is '[t]he gravamen of the right to recover damages for wrongful seizure or detention of vessels.' " *El Paso Production Gom, Inc. v. Smith*, 2009 WL 1870494, 2 -3(E.D.La., 2009).

157. "[A] court may infer bad faith from a lack of probable cause for a plaintiff's claims." *Id.* at 5.

158. A party has the right to recover damages for wrongful arrest or seizure in admiralty on a showing of "bad faith, malice, or gross negligence." *Tennyo Maritime v. Norsk Hydro S.S. of Olso*, 1994 WL 279849 (E.D.La. 1994)(citing *Incas &Monterey Printing v. M/V Sang Jin*, 747 F.2d 958, 964 (5th Cir. 1984)).

159. In admiralty suits involving wrongful seizure, a court has the discretion to impose attorney's fees on a party if the "party seizing the vessel acted in bad faith with malice or with wanton disregard for the rights of his opponent." *Cardinal Shipping Corp. v. M/X Seisho Maru*, 744 F.2d 461, 474 (5th Cir. 1984).

160. Upon finding that the arrest of a vessel was in bad faith, the award of attorney's fees was appropriate even though the court awarded no damages. *Pace Shipping Services Network SA v. M/V OCEAN D*, 2003 WL 21715007, 3 (E.D.La.,2003).

161. "The burden is upon the plaintiff to prove the extent of the damages actually sustained by him." *Baker Hughes Oilfield Operation, Inc. v. Seabulk Tankers, Inc.*, 2004 WL 1290576, *2 (E.D. La. June 8, 2004).

162. "For there to be recovery for loss of use, plaintiffs must prove that the vessel would have been used." *Baker Hughes*, at *2 (citing *Inland Oil and Transport v. Ark–White Towing*, 696 F.2d 321, 326 (5th Cir.1983)(abrogated on different grounds by *City of Milwaukee v. Cement Div., Nat. Gypsoum Co.*, 515 U.S. 189 (1995); *Johnson v. Otto Candies, Inc.*, 828 F.2d 1114, 1119 (5th Cir. 1987)).

163. "Damages for lost profits arising from the loss of use of a vessel for repairs after a collision or other maritime tort is allowed 'when profits have actually been, or may reasonably [been shown] [sic] to have been lost, and the amount of such profits is proved with reasonable certainty.'" *Id.* (citing *Dow Chemical*, 815 F.2d at 1042.

164. The court in *Baker Hughes* awarded damages for loss of charter hire based on specific evidence that the vessel lost two jobs that would have lasted three days. However, it determined that there was no other evidence of lost profits actually sustained by it during the 26 days that the vessel underwent repairs following a collision and declined to award the plaintiff any other damages for lost profits. *Baker Hughes*, 2004 WL 1290576, at *2-3.

19

165. In *John W. Stone*, the court found that plaintiff had a valid maritime lien on defendant's vessel (later determining that it was barred by laches) but that even if defendant were entitled to prevail on the wrongful arrest claim, defendant "did not introduce any evidence from which the court could conclude that [it] suffered damages as a proximate result of any conduct on the part of [plaintiff]. Lost profits are compensable only if they can be proven with reasonable certainty . . . [and] [t]here was no evidence introduced upon which the court could establish lost profits with reasonable certainty." *John W. Stone Oil Distrib., Inc. v. M/V Miss Bern*, 663 F. Supp. 773 at 780 (S.D. Ala. 1987).

166. In *Inland Oil*, the court held that loss of use was not proved with reasonable certainty where there was "no evidence that the ... barges *would have been used* during this time span." *Inland Oil*, 696 F.2d at 326 (emphasis in original).

167. Owners have failed to introduce any evidence to allow the Court to find with reasonable certainly that the arrest of the Vessels caused actual damages.

168. Liquidated damages are to be used to put the non-breaching party in the same position in which it would have been but for the breach. *Farmers Export Co. V. M/V Georgis Prois, Etc.*, 799 F.2d 159, 163 (5ᵗʰ Cir. 1986).

169. Liquidated damages cannot be assessed as a penalty. *Id.* at 162; *Louis Dreyfus Corp. V. 27,946 Long Tons of Corn*, 830 F.2d 1321, 1331 (5ᵗʰ Cir. 1987).

170. The burden of proving that a liquidated damages provision constitutes a penalty is on the party urging the penalty construction. *Farmers Export Co.*, 799 F.2d at 162.

171. "Whether the liquidated damages provision is a penalty is a question of law for the court. [The Fifth Circuit] applies the two-part test set forth in the Restatement (Second) of Contracts § 356, comment b, to determine whether a liquidated damage clause constitutes a penalty": (1) whether the charge "approximates the actual loss that has resulted from a particular breach" or "approximates the loss anticipated at the time of the making of the contract;" and, (2) "the difficulty of proof of loss," which is considered on the principle that "[t]he greater the difficulty of proof of loss [under factor 2], the more flexibility is allowed in approximating the anticipated or actual harm [under factor 1]." *Louis Dreyfus Corp.*, 830 F.2d at 1331.

172. In evaluating whether a liquidated damages provision is an unenforceable penalty, "[n]either the parties' actual intention as to its validity nor their characterization of the term as one for liquidated damages or a penalty is significant in determining whether the term is valid."[3] Restatement (Second) of Contracts, §356, comment (c)(1981).

---

[3] Therefore, the fact that Article 8 "Termination Agreement" in the Management Agreement provides that "Owner shall pay COMAR, not as a penalty, but as liquidated damages ..." is irrelevant.

173. Additionally, "a court will look to the substance of the agreement to determine whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this Section." *Id.*

174. Under these principles, Comar's liquidated damage claims fail as a matter of law under the Fifth Circuit's decision in *Louis Dreyfus Corp. v. 27,946 Long Tons of Corn,* 830 F.2d 1321 (5th Cir. 1987), which held that a dock tariff providing a purported $30,000 liquidated damage charge constituted an improper penalty for less than a full 24-hour delay based on the language and potential effect of the provision as a whole: "Under the agreement if a vessel occupied the berth for one hour [plaintiff] could recover twenty-four times its actual anticipated cost. . . [and thus] the contract fails to approximate the loss anticipated for such periods." *Id.* at 1332.

175. The Termination Fee provisions of the Agreements do not approximate Comar's alleged actual prospective losses because, pursuant to Article 8, the Termination Fee formula produces an artificially inflated result in that the baseline "average gross daily charter hire" number is derived only from the "days the Vessel has actually worked" instead of the total days in the month.

176. Thus, if the vessel only "actually worked" 5 days of every month preceding termination, the "Termination Fee" provision would nonetheless allow Comar to collect a "Termination Fee" based on an overinflated per-day "average gross daily charter hire" figure because the "average" does not account for prior non-working days.

177. Using this over-inflated "average gross daily charter hire" as a baseline, the total "Termination Fees" are then calculated using a prospective 100% assumed utilization (i.e. by multiplying that inflated baseline amount by every single day of the remainder of the Agreements).

178. In effect, the Termination Fee provisions allow Comar to double-dip by using an inflated baseline and then multiplying it by an inflated utilization.

179. Under Comar's standard management fee under the Agreements, "(i) $3,000 per calendar month; or (ii) ten (10%) percent of the gross income of the Vessel per month," non-working days would be inherently accounted for in the standard monthly compensation rate whether the vessel worked 1 day or 31 days, the rate would be 10% of the gross working income from both working and non-working days in the month.

180. Owners' premature termination of the Agreements cost Comar the opportunity to earn management fees for the remaining term of the Agreements.

181. The Court finds that the Agreements' default monthly management fee under Article 3 fixes any uncertainty or difficulty otherwise involved in determining losses for non-working months under the Agreements and provides a ceiling for determining any alleged losses.

21

182. The Louisiana Unfair Trade Practices Act ("LUTPA"), declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are illegal, and likewise confers a private right of action on "any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal," from these unfair trade practices. La. Rev. Stat. §51:1405 & 1409(A).

183. Louisiana courts have held that actions "tantamount to an abuse of process" may constitute "an unfair trade practice within the contemplation of" LUTPA. *Bank of New Orleans and Trust Co. v. Phillips*, 415 So. 2d 973, 975 (La. App. 4 Cir. 1982); *Marshall v. Citicorp Mortg. Inc.*, 601 So.2d 669, 671 (La. App. 5 Cir. 1992) ("[A] legal practice may be an unfair trade practice, depending on the facts and circumstances of the particular case.")

184. Agreeing as surety "to pay damages for another's breach of a maritime charter is not a maritime contract," and is therefore governed by state law. *Roswell Navigation v. Poseidon Marine Consultants, Inc.*, 1997 WL 680576, 2 (E.D.La.,1997).

185. "A contract of guaranty is equivalent to a contract of suretyship." *Mones v. BP America, Inc.*, 2011 WL 3320814, 4 -5 (E.D.La.,2011)

186. Suretyship is defined as "an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so." La. Civ. Code art. 3035.

187. Suretyship must be express and in writing. La. Civ. Code art. 3038.

188. In ascertaining the intention of the parties to a contract, where it cannot be adequately discerned from the contract or agreement as a whole, the facts and circumstances surrounding the parties at the time of contracting are a relevant subject of inquiry. *Bossier Orthopaedic Clinic v. Durham*, 747 So.2d 731, 736 (La.App. 2 Cir.,1999).

*The Court's Conclusions*

Breach of Contract

189. The Court finds that Comar did not breach the Agreements by failing to use either its "best efforts" or "all reasonable efforts as a prudent operator" in the management and operation of the Vessels.

190. The Court finds that because Comar did not engage in arbitrary or capricious action nor intentionally divert incoming work from the Vessels, it did not breach the general maritime law duty of good faith and fair dealing in the management and operation of the Vessels.

191. The Court finds that the Agreements were neither adhesionary nor unduly harsh such that they should be rendered unconscionable.

192. The Court finds that Owners' premature termination of the Agreements constituted a material breach of the Agreements.

LUPTA

193. The Court finds that the Marine Logistics Entities have failed to establish that Comar violated the LUPTA.

Wrongful Arrest

194. The Court finds that Comar is not entitled to the advice of counsel defense, as Comar did not exercise reasonable diligence to ascertain and provide a full disclosure of all the known facts which caused the arrest to be made, and therefore, Comar did not act upon the advice honestly and in good faith.

195. The Court has previously held that Comar had no right to any lien as either a joint-venturer or as a general agent of the Marine Logistics Entities.

196. The Court finds that Comar lacked probable cause to arrest the Vessels and the Court will infer bad faith based on Comar's actions surrounding the arrest of the Vessels as well its post-arrest acts.

197. The Court further finds that, based on Comar's actions of asserting liens for A/P, Owners' Expenses, despite the existence of more than adequate outstanding A/R to satisfy all amounts, Comar was in bad faith when it arrested the Vessels on August 18, 2009.

Damages

198. The Court finds that  Comar's wrongful arrest of the Vessels caused the Marine Logistic Entities damages in the form of lost charter hire revenues during the period of arrest as follows: the M/V Marauder for 35 days;  the M/V Conqueror for 37 days; the  M/V Enforcer for 37 days; and the M/V Raider for 0 days, as it was laid up at the time of arrest.

Termination Fees

199. The Court finds that the termination fees in Article 8 of the Agreements constitute penalties rather than liquidated damages.

200. The Court finds that Comar is not entitled to termination fees as provided under Article 8 of the Agreements.

201. The Court finds that Comar is entitled to liquidated damages in the amount of $3,000 per calendar month from the date of termination, August 14, 2009, until the date the Agreements would have otherwise terminated pursuant to the contract.

Personal Guaranty

202. The Court finds that Lirette is liable to Comar, *in solido,* with each of Conqueror Marine, Enforcer Marine, Marauder Marine, and Raider Marine for the amounts due Comar.

203. The Court finds that St. Amand is liable to Comar, *in solido,* with each of Conqueror Marine, Enforcer Marine, Marauder Marine, and Raider Marine for the amounts due Comar.

Attorneys' Fees

204. The Court finds that Comar is entitled to recover Attorneys' Fees and Expenses pursuant to Article 17 of the Agreements based on Owners' breach of Article 2. TERM., of the Agreements.

205. The Court finds that the Marine Logistics Entities are entitled to recover Attorneys' Fees and Expenses pursuant to Article 17 of the Agreements based on Comar's wrongful arrest of the Vessels.

Richard T. Haik
United States District Judge